

EOD
09/24/2007

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **ELIZABETH ELENA DARBY** | § | |
| xxx-xx-8155 | § | Case No. 04-61246 |
| P.O. Box 157, Alba, TX 75410 | § | |
| | § | Chapter 7 |
| Debtor | § | |

| | | |
|---|---|---|
| WILLIAM T. NEARY, | § | |
| United States Trustee | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Adversary No. 06-6004 |
| | § | |
| ELIZABETH ELENA DARBY | § | |
| | § | |
| Defendant | § | |

## MEMORANDUM OF DECISION

Now before the Court is the complaint of William T. Neary, United States Trustee (the "Trustee"), seeking to revoke the discharge of the Defendant-Debtor, Elizabeth Elena Darby (the "Debtor"), pursuant to 11 U.S.C. §727(d)(1). Trial of the issues presented by the complaint was conducted on June 5, 2007. At the conclusion of the hearing, the Court took the matter under advisement. This memorandum of decision disposes of all issues pending before the Court.[1]

---

[1] This Court has jurisdiction to consider the complaint pursuant to 28 U.S.C. §1334 and 28 U.S.C. §157(a). The Court has the authority to enter a final judgment in this adversary proceeding since it constitutes a core proceeding as contemplated by 28 U.S.C. §157(b)(2)(A), (J), and (O).

## Background

In June 2004, the Debtor, Elizabeth Elena Darby, was involved in contentious divorce litigation with her soon-to-be ex-spouse, Chester Darby, before the 402nd Judicial District Court in Wood County, Texas. Things were not progressing well in that proceeding for Ms. Darby, and, in order to forestall the entry of rulings in that case adverse to her interests, the Debtor, undoubtedly at the urging of her divorce attorney, Robert Bandy, filed a voluntary petition for Chapter 13 relief in this Court on June 10, 2004. After various extensions of time were granted, the Debtor, through Mr. Bandy, who initially represented her in the bankruptcy case as well, filed her original bankruptcy schedules on July 30, 2004 (the "Original Schedules").

The Debtor subsequently failed to prosecute her Chapter 13 case properly, and, in order to avoid a dismissal of her case for failure to make plan payments, voluntarily converted her case to Chapter 7 on December 7, 2004. Bob Anderson (the "Trustee") was appointed as the Chapter 7 Trustee. Following the conversion and after another brief extension of time, the Debtor filed amended schedules on December 23, 2004 (the "Conversion Schedules"). After one continuance, the Trustee concluded the meeting of creditors conducted under §341(a) on February 7, 2005, and the Debtor was granted a Chapter 7 discharge on March 18, 2005.

Minimal bankruptcy case activity occurred thereafter through the remainder of 2005. However, pursuant to an agreed order regarding relief from automatic stay entered

during the Chapter 13 phase of the bankruptcy case, the divorce proceedings were continuing, culminating in the entry of a final decree of divorce on December 19, 2005. Ten days later, pursuant to the agreement of the parties reflected in the earlier stay order which required bankruptcy court approval of any subsequent property division, Chester Darby filed a motion to gain such approval. Attached to the motion for approval was a copy of the divorce decree that incorporated by reference certain attached lists of personal property being addressed by the decree, including a list of sole and separate property of the Debtor which had been attached as an exhibit to her 2001 prenuptial agreement with Chester Darby. These lists contained references to properties purportedly belonging to the Debtor that were not listed in the bankruptcy schedules which she filed prior to the entry of her discharge order.

Upon obtaining these additional sources of information in 2006, the Trustee soon discovered that the bankruptcy schedules previously supplied to him contained a litany of omissions, inconsistencies, and undervaluations. Chief among them were the Debtor's failure to accurately schedule two Joseph Kliesch oil paintings on her Original Schedules and her failure to schedule various pieces of jewelry that were included on her 2001 prenuptial agreement[2] and later reported stolen in May 2005, long after the filing of her bankruptcy petition in June 2004. The Kliesch paintings, valued collectively at $1,000 on

---

[2] The Debtor vehemently contended that because the exhibit to the prenuptial agreement was prepared for her own familial purposes rather than for any legal purpose, one should not expect the bankruptcy schedules to be entirely consistent with that list. Be that as it may, the list amounts to some evidence of what the Debtor believed her assets to be worth prior to any contemplation of bankruptcy.

the Debtor's Original Schedules, had been previously valued at $12,000 *each* on the prenuptial agreement. The Trustee later learned that, in the period subsequent to the entry of her discharge order, the Debtor had surreptitiously consummated the sale of one oil painting by Joseph Kliesch — not for $1,000 nor $12,000 — but rather for the sum of $175,000.[3] The Trustee further discovered that a second Kliesch oil painting had been delivered by the Debtor to an art dealer in California, who had already closed a second sale for yet another $175,000, but that such dealer had not yet transferred the sale proceeds to the Debtor. The Trustee arranged to obtain possession of those sale proceeds, and subsequently filed a motion for turnover of other assets against the Debtor, alleging that the final decree in the divorce proceeding awarded to the Debtor several items of personal property that had not been properly scheduled in the bankruptcy case.

The discovery of the clandestine sales of art by the Debtor at prices astronomically beyond what had been scheduled triggered the filing of the present adversary complaint against the Debtor on January 25, 2006.[4] Amended schedules filed on February 20, 2006

---

[3] This amount apparently included $25,000 of auctioneer and selling fees. The Trustee demanded, and subsequently received from the Debtor, turnover of the proceeds arising from that sale.

[4] Trial of this matter was delayed due to an abatement of this dispute for some months pending the resolution of a related adversary proceeding brought by the Chapter 7 Trustee involving ownership of some of the disputed assets.

(the "Final Schedules")[5] by the Debtor revealed even more omissions from the two prior sets.[6]

Based upon the foregoing scenario, the United States Trustee seeks to revoke the Debtor's discharge pursuant to §727(d)(1) since it was allegedly procured by fraud. The Debtor simply responds by contending that any omission or undervaluation of assets in her series of schedules was inadvertent and unintentional.

## Discussion

The Trustee brings this adversary complaint under 11 U.S.C. §727(d)(1), which provides:

> (d) On request of the trustee, a creditor, or the United States Trustee, and after notice and a hearing, the court shall revoke a discharge granted under subsection (a) of this section if–

---

[5] Actually, a fourth set of schedules was filed on March 2, 2006, which for the first time claimed that some of the assets in question, though previously scheduled by the Debtor, actually belonged to the Debtor's mother. The March 2, 2006 schedules triggered the filing of the aforementioned adversary by the Chapter 7 Trustee, who sought a declaratory judgment as to the ownership of the disputed assets. As issues raised in this adversary stood abated, the issues surrounding those schedules were addressed in the related adversary and are germane to the present adversary only in that they shed light upon the validity of the Debtor's stated intentions.

[6] The Final Schedules included the following pieces of jewelry (and assigned values) which were omitted from the Original Schedules and from the Conversion Schedules: (1) a pearl and diamond cocktail ring in platinum ($3,200); (2) a garnet cocktail ring in gold ($2,800); (3) a pavé diamond heart pendant ($1,200): (4) a diamond heart pendant ($1,200); (5) a diamond tennis bracelet ($1,600); (6) a diamond cocktail ring ($3,200); and (7) a white amethyst ring ($4,500). The Original and Conversion Schedules only listed costume jewelry valued at $100. All of these items were allegedly stolen from Debtor's home in May, 2005. The valuation of other jewelry items and a fur coat by the Debtor were also questionable.

>(1) such discharge was obtained through the fraud of the debtor, and the requesting party did not know of such fraud until after the granting of such discharge; . . . .

11 U.S.C. §727(d)(1).

Because the "principal purpose of the Bankruptcy Code is to grant a fresh start to the honest but unfortunate debtor," *Marrama v. Citizens Bank of Mass.,* ___ U.S. ___, 127 S.Ct. 1105, 1107, 166 L.Ed.2d 956 (2007)(citations and internal quotations omitted), the revocation of a discharge under §727(d) is "an extraordinary remedy to be sparingly applied." *Fokkena v. Peterson (In re Peterson)*, 356 B.R. 468, 475 (Bankr. N.D. Iowa 2006), *citing Miller v. Kasden (In re Kasden),* 209 B.R. 239, 241 (B.A.P. 8th Cir. 1997). Thus, relief under §727(d) is construed strictly against any objecting party and liberally in favor of the debtor. *Lightfoot v. Landry (In re Landry),* 350 B.R. 51, 56 (Bankr. E.D. La. 2006).

"[T]he party moving for a revocation of discharge is charged with the burden of proving all of the facts upon which revocation is conditioned." *NCNB Texas Nat'l Bank v. Hayes (In re Hayes),* 127 B.R. 795, 797 (Bankr. E.D. Tex. 1991)(citations and internal quotations omitted). Such a burden, as recently summarized in a bankruptcy decision from the Western District of Texas, entails the following:

>In a 727(d)(1) revocation of discharge action such as this, the plaintiff's burden is to prove that the debtor's fraud caused the discharge and that the plaintiff lacked knowledge of that fraud prior to the deadline for objecting to discharge. *See In re Damaia,* 217 F.3d 838 (Table) (4th Cir. 2000); *In re Nielsen,* 383 F.3d 922, 925 (9th Cir. 2004) ("obtained

through" as used in the statute, is causation language). When the basis is the debtor's failure to disclose the existence of assets, the plaintiff must show that the debtor's actions or mistakes were knowingly and fraudulently made, and that the mistakes were material, and that the plaintiff was unaware of the facts at issue when the debtor sought his discharge. *See In re Slack,* 143 Fed. Appx. 628 (5th Cir. 2005). . . .

      The fraudulent failure to report property that should have been property of the estate can form the basis for revocation of the debtor's discharge previously granted. 11 U.S.C. § 727(d)(1); *In re Edmonds,* 924 F.2d 176, 180 (10th Cir. 1991); *Matter of Yonikus,* 974 F.2d 901, 904 (7th Cir. 1992). In *Yonikus,* the Seventh Circuit explained that "debtors have an absolute duty to report whatever interests they hold in property, even if they believe their assets are worthless or unavailable to the bankruptcy estate." However, the Seventh Circuit went on to explain that, for the trustee to succeed in a discharge revocation action, the trustee must establish that the debtor's failure to report was done knowingly and fraudulently. *Id.* at 905. The trustee can sustain that burden by demonstrating, *inter alia,* "the debtor's awareness of the omitted asset . . . and that failure to list the asset could seriously mislead the trustee or that the debtor acted so recklessly in not reporting the asset that fraud is implied. . . . [A] finding of fraudulent intent may be based on inferences drawn from a course of conduct . . . [or] from all of the surrounding circumstances." *Id.; see also Matter of Reed,* 700 F.2d 986, 991 (5th Cir. 1983) (whole pattern of conduct supported finding of fraudulent intent); *see also In re Damaia,* 217 F.3d 838 (Table) (4th Cir. 2000) (plaintiff must prove lack of knowledge in time to timely object); *In re Nielsen,* 383 F.3d 922, 925 (9th Cir. 2004) ("obtained through" fraud, as used in the statute, is causation language).

      The . . . statute clearly imposes upon the debtor a duty to disclose assets as a matter of law. *See* 11 U.S.C. §§ 521(1), 521(3) (2004). And the

case law confirms that failure to disclose assets can form the basis for revocation of discharge, because the nondisclosure can prevent a trustee from even knowing of the assets' existence in time to object to discharge, resulting in the discharge being procured by the debtor's failure to fulfill his duty to disclose. *Matter of Yonikus,* 974 F.2d at 904; *In re Edmonds,* 924 F.2d, at 180; *see also In re Peli,* 31 B.R. 952, 955 (Bankr. E.D.N.Y. 1983).

*Lowe v. King (In re King)*, 2006 WL 3861097, at *3-5 (Bankr. W.D. Tex. Dec. 29, 2006).

The Debtor acknowledges the presentation of erroneous and misleading schedules prior to her discharge. However, she contends that such erroneous schedules were not knowingly presented with any fraudulent intent. She testified that the omissions and undervaluations were a result of the careless manner in which she reviewed the sets of schedules prior to signing them and that she was victimized by the actions of her former attorney, Mr. Bandy, who she claims transferred incorrect information from her divorce documents to her bankruptcy schedules. She further testified that, though she had listed the Kliesch paintings on her prenuptial agreement at $12,000 each in order to inform her family that they had value,[7] she claims to have been unaware of the actual market value of those pieces.

Proving that actions by an individual are taken knowingly and with a fraudulent intent is not a simple matter, for rare will be the debtor who willingly provides direct evidence of a fraudulent intent. Instead, the existence of a fraudulent intent is most often

---

[7] There is some reason to believe that the Debtor intended the paintings to be listed on the prenuptial agreement exhibit at $12,000 total, rather than $12,000 each, but even if that were so, the Debtor clearly undervalued them on her Original Schedules.

-8-

betrayed by an examination of a course of conduct. *Reed*, 700 F.2d at 991 [finding that a debtor's whole pattern of conduct evinces his fraudulent intent]; *Yonikus*, 974 F.2d at 904 ["The bankruptcy court's finding of fraudulent intent may be based on inferences drawn from a course of conduct . . . [or] from all of the surrounding circumstances."]. Additionally, "[f]raudulent intent may be proved by showing either actual intent to deceive or a reckless indifference for the truth." *Neary v. Hughes (In re Hughes)*, 353 B.R. 486, 504 (Bankr. N.D. Tex. 2006); *see also*, *Sholdra v. Chilmark Fin., LLP (In re Sholdra)*, 249 F.3d 380, 382-83 (5th Cir. 2001).

The Court finds that the Debtor knowingly and fraudulently misstated the existence and value of her assets on her bankruptcy schedules prior to the entry of her discharge order. These were not innocent mistakes. The Debtor knew that she owned Kliesch paintings which were worth far more than $1,000 — the amount at which she scheduled them prior to the entry of the discharge order. The Debtor knew that she owned jewelry with a minimum value of $17,000. Yet her Original and Amended Schedules omit the jewelry entirely, and her Original Schedules substantially undervalue the Kliesch paintings. Neither of these misstatements was corrected until after the initiation of this adversary proceeding. These omissions and misleading undervaluations on the Debtor's schedules were neither accidental nor inadvertent and the Debtor's testimony in that regard is not credible.[8] Indeed the Debtor admitted that the jewelry had

---

[8] Indeed the Court finds, based primarily on the former paralegal's testimony, that the Debtor was extensively involved in the preparation of her bankruptcy schedules, with draft documents being cycled

a significant sentimental value, as well as an economic value, to her, and the Court is convinced that the Debtor knew that the valuable Kliesch paintings could provide a degree of economic security in her post-bankruptcy life. She was determined to minimize, if not eliminate, the risk of losing them in her bankruptcy proceeding, particularly when it was primarily initiated for a non-financial purpose – to prevent further damage arising from her contentious divorce litigation.

The Court further rejects the Debtor's contention that she was an innocent victim of mistakes made by her attorney. While a debtor's reliance on advice of counsel can, under proper circumstances, constitute an excuse for an omission of assets from schedules when there has been a full disclosure of all pertinent facts to the lawyer and such reliance has been placed reasonably and in good faith, *see, e.g., Stanton v. Temecula Valley Bank (In re Stanton)* 2007 WL 2538431, at *5 (S.D. Tex. Aug. 31, 2007), *Sicherman v. Rivera (In re Rivera)*, 338 B.R. 318, 326 (Bankr. N.D. Ohio 2006), "the advice of counsel is not a defense when it is transparently plain that the property should be scheduled." *Stanton*, 2007 WL 2538431, at *5, *citing Morton v. Dreyer* (*In re Dreyer*), 127 B.R. 587, 598 (Bankr. N.D. Tex. 1991) ["A debtor who signed a petition and schedules under oath and penalty of perjury, but who intentionally failed to list numerous assets of substantial value and transactions with which he was intimately familiar is not entitled to a discharge because he made false oaths in the petition."]. In this instance, the Debtor was throughly

---

between the Debtor and her attorney's office up to ten times.

involved in the preparation of her bankruptcy schedules. The content and import of those documents were not lost upon her. Indeed the Debtor testified that she was aware that misrepresentations on her schedules could mislead the bankruptcy trustee and her creditors. However, "her" property had to be protected. Though the Debtor probably failed to receive sound, professional advice from her initial attorney at various stages of the bankruptcy proceeding, his action of providing more detailed information regarding the Debtor's assets was not one of those failures. Indeed it was consistent with the Debtor's duties under §521. Thus, the Court finds that the Debtor knowingly and fraudulently failed to disclose the existence and value of estate property.

Secondly, the Debtor's omissions and misrepresentations with regard to the scheduling of her assets were unquestionably material. An omission is material "if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992). A finding of materiality is not dependent upon the value of the omitted assets or whether the omission was detrimental to creditors. *Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561, 566 (5th Cir. 2005). In this case, the omissions and misleading valuations not only bore a relationship to the estate, but they also had a dramatic effect on the administration of the case and the eventual dividend to creditors. At the time of discharge, the disclosure of such a limited amount of assets had the Chapter 7 Trustee convinced that no purpose

would be served by an estate administration. With full disclosure, it appears as though the bankruptcy estate will have assets sufficient to pay all allowed claims in full. In the absence of the Trustee's discovery of the missing and undervalued assets, the economic interests of the creditor body would have undoubtedly been materially harmed and the Debtor would have received a discharge without providing the *quid pro quo* for such legal protection — not only the full and complete disclosure of the existence of her assets but also the full and complete disclosure of her informed knowledge about the value of those assets. *See Pratt*, 411 F.3d at 566 (internal quotations omitted) ["Full disclosure of assets and liabilities in the schedules required to be filed by one seeking relief under Chapter 7 is essential, because the schedules serve the important purpose of insuring that adequate information is available for the Trustee and creditors without need for investigation to determine whether the information provided is true."].

Finding that the Debtor had the requisite intent to support a revocation of her discharge, and that her knowing and fraudulent statements were material, the only remaining issue is whether, in the language of the statute, "the requesting party did not know of such fraud until after the granting of such discharge." 11 U.S.C. §727(d)(1). Though some courts view this lack of knowledge requirement more leniently, this Court believes that "knowledge in a §727(d)(1) revocation action occurs when the party seeking revocation first becomes aware of facts such that he is put on notice of a possible fraud."

*Landry,* 350 B.R. at 56. This standard was succinctly stated in *Anderson v. Vereen (In re Vereen)*, 219 B.R. 691 (Bankr. D.S.C. 1997):

> [I]n a revocation action under § 727(d)(1), the plaintiff must show due diligence in investigating and responding to possible fraudulent conduct once he or she is aware of it or is in possession of facts such that a reasonable person in his or her position should have been aware of a possible fraud. This standard is consistent with the case law from other jurisdictions and is consistent with the goal of Chapter 7 to grant debtors a fresh start. This is not to say that a trustee is required to suspect that every debtor is committing fraud in his schedules. As a general rule, the trustee is entitled to rely on the truthfulness and accuracy of the debtor's schedules and is not required to assume that the debtor is lying. However, once the trustee is in possession of facts that would put a reasonable person on notice of a possible fraud, he has a duty to diligently investigate to determine if grounds exist for the denial of the Debtor's discharge and if so to timely file a complaint.

*Id*. at 696 (internal quotations omitted). In this instance, the Plaintiff, the United States Trustee, has successfully demonstrated that neither his office nor the Trustee had any knowledge of facts sufficient to place them on notice of any possible fraud prior to the time that the Debtor was granted a discharge in this case. Indeed, the evidence clearly establishes that it was almost nine (9) months after the entry of the discharge order when the conclusion of the divorce litigation enlightened the Trustee about the Debtor's

potentially fraudulent conduct and the Trustee's diligent investigation regarding the schedule deficiencies began.[9]

### Conclusion

Accordingly, the Court concludes that all of the elements for revocation of discharge under 11 U.S.C. §727(d)(1) have been demonstrated by a preponderance of the evidence, and the discharge previously granted to the Debtor, Elizabeth Elena Darby, on March 18, 2005 **[dkt #41]** should be revoked.

This memorandum of decision constitutes the Court's findings of fact and conclusions of law[10] pursuant to Fed. R. Civ. P. 52, as incorporated into contested matters in bankruptcy cases by Fed. R. Bankr. P. 7052 and 9014. A separate judgment will be entered which is consistent with this opinion.

Signed on 09/24/2007

*/s/ Bill Parker*

THE HONORABLE BILL PARKER
CHIEF UNITED STATES BANKRUPTCY JUDGE

---

[9] Prior to that time, it is likely that the Debtor's soon-to-be ex-spouse, Chester Darby, knew of the existence of the undisclosed or undervalued properties, although no evidence was tendered that Mr. Darby had actual knowledge of the contents of the Debtor's bankruptcy schedules. However, even if he did, such knowledge cannot be legitimately imputed to either the Trustee or to the United States Trustee. *See, e.g., Walton v. Staub (In re Staub)*, 208 B.R. 602, 606 (Bankr. S.D. Ga. 1997).

[10] To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. The Court reserves the right to make additional findings and conclusions as necessary.